**Jeremiah Ross, OSB No. 105980**
Email: ross@rosslawllc.com
Ross Law LLC
50 SW Pine St. Suite 402
Portland, Oregon 97204
Phone: (503) 224-1658
Fax: (888) 499-2575

Attorney for Plaintiff

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| PAUL GALM, personal representative for the estate of DYLLAN NANOSKI, <br><br> Plaintiff, <br><br> v. <br><br> STATE OF OREGON, by and through the Oregon Youth Authority; JOHN MALONE, in his individual capacity; SHANNON MOSHOFSKY in her individual capacity; STACEY VARNER in her individual capacity; BRENDAN DUMMIGAN as Guardian *ad litem* for GILBERTO DE JESUS-RENTAS, in his individual capacity; DANIEL BERGER, in his official and individual capacity; TARA WILLIAMS in her individual capacity; and LARA DOREGIOS, in her individual capacity. <br><br> Defendants. | Case No. 3:23-cv-00962-SB <br><br> SECOND AMENDED COMPLAINT (Wrongful Death and Violation of Civil Rights) <br><br> JURY TRIAL DEMANDED <br><br> Not Subject to Mandatory Arbitration <br><br> Prayer Not to Exceed: $9,002,179.00 |

Paul Galm, personal representative of the Estate of Dyllan Nanoski, alleges as follows:

1.

This case is not subject to mandatory arbitration due to the amount of the prayer.

2.

Page 1 – SECOND AMENDED COMPLAINT

The Oregon Youth Authority ("OYA") is a duly authorized agency of Defendant State of Oregon that is responsible for the delivery and administration of programs and services to children and young adults to hold youth accountable and provide them with opportunities for reformation through treatment, education, and other guidance.  At all times material, OYA employed or otherwise engaged as agents to provide Dyllan Nanoski treatment, education, and guidance.  These agents included John Malone, who was a juvenile parole and probation officer "JPPO" and his supervisor Tara Williams.

3.

Defendant John Malone was a JPPO for the State of Oregon and at all times was acting under color of state law and within the course and scope of his employment and had the authority to recommend paroling wards or terminating parole.  He is named individually.

4.

Defendant Tara Williams was a JPPO supervisor for the State of Oregon and at all times material supervised JPPO Malone and had authority to revoke parole and recommend paroling wards from MacLaren and/or terminating parole.  At all times she was acting under color of state law and within the course and scope of her employment.  She is named individually.

5.

Defendant Daniel (also known as "DAN") Berger ("Berger") was at all times relevant, the Superintendent of MacLaren Youth Correctional Facility (MacLaren).  Berger was responsible for the safety of wards housed at MacLaren and had the authority to approve the parole of wards from MacLaren.  Berger is named in his official and individual capacity.

6.

Page 2 – SECOND AMENDED COMPLAINT

At all times material, Defendant Shannon Moshofsky was a Qualified Mental Health Provider at MacLaren Youth Correctional Facility and at all times was acting under color of state law and within the course and scope of her employment.

7.

Defendant Lara Doregios was a medical or mental health provider at MacLaren Youth Correctional Facility and at all times was acting under color of state law and within the course and scope of her employment.  She is being sued in her individual capacity.

8.

Defendant Gilberto De Jesus-Rentas was a medical provider at MacLaren Youth Correctional Facility and at all times was acting under color of state law and within the course and scope of his employment. He is being sued in his individual capacity through his Guardian *ad litem* in this matter, Brendan Dummigan.

9.

Defendant Stacey Varner was a medical provider at MacLaren Youth Correctional Facility and at all times was acting under color of state law and within the course and scope of her employment.  She is being sued in her individual capacity.

10.

OYA states that while your child is with the Oregon Youth Authority, "We will make sure their needs are met.  This includes medical care, dental care, and mental health care."

11.

OYA operates the MacLaren Youth Correctional Facility "MacLaren" located in Woodburn, Oregon.

12.

Page 3 – SECOND AMENDED COMPLAINT

At all times material herein, Plaintiff, Paul Galm, was duly appointed, and qualified to act as, the Personal Representative of the Estate of Dyllan Nanoski (DOB January 13, 2001), deceased (hereinafter referred to as "Dyllan").

13.

In the early Summer of 2019, the 18-year-old Dyllan was placed in the Oregon State Hospital in order to restore his mental competency to address an OYA parole violation.

14.

Dyllan was treated for significant mental health issues while at the Oregon State Hospital.

15.

In the Fall or Winter of 2019, Dyllan was released from the State Hospital and sent to MacLaren Youth Facility where he was subjected to a psychological intake assessment. The assessment noted prior suicide attempts, and years of auditory hallucinations that were getting worse. The State's psychologist "strongly recommended" placement in a locked mental health facility to treat "a serious chronic mental health disability."

16.

In or around April 2020, Dyllan was released from MacLaren to a group home where he violated parole and was sent back to MacLaren Youth Correctional Facility.

17.

In or around February 2021, Dyllan was released from MacLaren to his mother and father's house in Corvallis, Oregon. John Malone was assigned to be his parole officer.

18.

Page 4 – SECOND AMENDED COMPLAINT

Immediately after Dyllan's release to his parent's home, Dyllan's mother and father noticed Dyllan exhibiting the unusual behavior of him isolating himself in his room and constantly pacing back and forth while talking to himself.

19.

In April 2021, Dyllan was still under the supervision of JPPO Malone.  JPPO Malone was informed that Dyllan was not receiving mental health services at the time.

20.

In April 2021 Dyllan absconded from Oregon.

21.

On April 13, 2021, Dyllan was apprehended out of the State of Oregon.

22.

On April 21, 2021, the State of Oregon arranged for Dyllan to be flown to Portland, Oregon where he was met by JPPO Malone.

23.

On April 21, 2021, JPPO Malone drove Dyllan from Portland, Oregon to Dyllan's mother and father's home in Corvallis, Oregon, and released Dyllan.

24.

Dyllan's parents immediately observed Dyllan exhibiting unusual behavior.  Dyllan informed his parents he had left the State of Oregon to kill himself and that he had a soft-shell crab in his neck that needed to be removed.

25.

Page 5 – SECOND AMENDED COMPLAINT

Dyllan was taken to a local hospital and noted that he wanted to go to the Oregon State Hospital, but he was informed there was no bed space or any other available options.

26.

On April 27, 2021, Dyllan contacted JPPO Malone to self-report that he had been using narcotics and he feared he might harm himself or his family.  Dyllan called JPPO Malone later that day and informed JPPO Malone he wanted to go to the Oregon State Hospital.

27.

On April 27, 2021, JPPO Malone then initiated revoking Dyllan's parole because "Dyllan is a risk to himself as well as the community.  OYA is requesting his parole be revoked back to MacLaren YCF."

28.

On April 28, 2021, Dyllan admitted the parole violation and was sent to MacLaren. MacLaren's staff conducted an assessment and noted that Dyllan's behavior, affect, and mood were normal.  Dyllan noted that he had a mental health crisis and was prescribed various mental health medications, but McLaren staff did not order any medications for him at that time.

29.

On April 28, 2021, Dyllan's mother began to search for in-patient mental health facilities throughout the West Coast that could immediately accept Dyllan.  Ms. Nanoski located an out-of-state in-patient mental health facility that had space for Dyllan.

30.

On May 5, 2021, Dyllan's mother informed JPPO Malone that she had arranged for Dyllan to enter a residential mental health treatment facility in California.

31.

Page 6 – SECOND AMENDED COMPLAINT

On May 7, 2021, Dyllan informed a mental health provider he needed to go to the Oregon State Hospital and was hearing voices.  Maclaren staff noted Dyllan was pacing back and forth and was "acting strange" and punching himself in the face.  Dyllan was then screened by Dr. Gilberto de Jesus-Rentas, MD, who was aware of Dyllan's previous suicide attempts and acute mental health issues.  Dr. Jesus-Rentas was also informed that Dyllan was not taking his prescribed medication.  Dr. Jesus-Rentas then prescribed Dyllan Zyprexa.

32.

On or about May 11, 2021, Dyllan sent a Health Care Request form to OYA noting he needed "Emergency mental health appointment please.  I sincerely am sick and need to go to state Hospital."  And that he had the problem for years and has been taking psychological medications.  OYA then referred him to a mental health provider.

33.

On May 12, 2021, Dyllan was found pacing back and forth speaking with himself and making odd vocalizations.  Dyllan informed Defendant Stacey Varner he was suffering from paranoia, voices, and a great deal of distress.  Dyllan requested again to go to the Oregon State Hospital and informed her that his symptoms were "bad."  Stacey Varner informed him a priority referral would be submitted, and Dyllan indicated he was relieved.  The priority referral was never submitted.

34.

On May 20, 2021, Dyllan was unable to sleep and constantly disturbed staff and other confined youth with his loud outbursts and hitting of walls.

35.

Page 7 – SECOND AMENDED COMPLAINT

On May 20, 2021, Shannon Moshofsky communicated to the Oregon State Hospital that she believed Dyllan Nanoski would benefit from placement and stabilization at the hospital. She noted that she had not ever made a referral to OSH and was hoping to get insight on how to begin the process.  She also communicated to the Oregon State Hospital that "This young person is decompensating quickly and I am concerned about the continued deterioration of his mental health."

36.

On May 25, 2021, Dyllan was found drawing a religious symbol on the floor in his own blood.

37.

On May 27, 2021, Dr. Jesus Rentas communicated with Dyllan.  Dyllan reported ongoing auditory hallucinations, difficulty concentrating, constantly moving, had disorganized thought and speech, his insight was poor, and his judgment was poor.

38.

On June 5, 2021, Dyllan was found with a noose made from a bed sheet in his room at MacLaren.

39.

Ms. Nanoski and JPPO Malone communicated back and forth regarding having Dyllan released directly from MacLaren to the residential facility.  On June 10, 2021, Ms. Nanoski asked JPPO Malone what the status of the release order was, so that Dyllan could be released directly to an out-of-state in-patient mental health treatment facility.  Tara Williams and John Malone were aware of Dyllan's deteriorating mental health.  Tara Williams communicated with John Malone that Dyllan must be off of parole to enter into the out-of-state in-patient facility.

Page 8 – SECOND AMENDED COMPLAINT

John Malone then indicated to Ms. Nanoski that Dyllan had to be off parole to enter into the out-of-state in-patient facility or get judicial permission to leave the state to enter the in-patient facility.

40.

 On June 14, 2018, Dyllan again informed Defendant Shannon Moshofsky that he desired to be sent to the Oregon State Hospital.

41.

On June 18, 2021, JPPO Malone communicated with Danielle Nanoski to ask her what time she could pick Dyllan up.  Ms. Nanoski asked if Dyllan would still be on Parole if released.  JPPO Malone could not give Ms. Nanoski a direct answer.  Ms. Nanoski agreed to pick Dyllan up at MacLaren YCF.

42.

On June 20, 2021, MacLaren drafted a "Summary of Discharge" for Dyllan, noting schizophrenia was a current acute condition and that Mental Health follow-up was due "as soon as possible."

43.

On June 21, 2021, at 0050 in the morning Dr. Gilberto De Jesus Rentas, MD reviewed Dyllan's chart and noted the June 14, 2021 request for Dyllan to go to the Oregon State Hospital and that his last face-to-face visit with a psychiatrist was May 27, 2021 where Dyllan refused to discuss his day to day activities and concerns regarding his psychotic symptoms.  The May 27, 2021 report noted that Dyllan denied having issues sleeping despite staff contradicting those statements.  The records reviewed also revealed that Dyllan was not regularly taking the prescribed lithium that was intended to stabilize and minimize the effects of schizoaffective

Page 9 – SECOND AMENDED COMPLAINT

disorder.  Dr. Jesus Rentas was also aware that Defendant Moshofksy reported that Dyllan was responding to internal stimuli, paranoia, and delusional thinking.  Dr. Jesus Rentas also observed that Dyllan was unable to stay still, constantly pacing, talking or mumbling to himself, intermittently laughing, responding to internal stimuli, had disorganized thought process, poor judgment, poor insight, and was positive for auditory hallucinations.  Dr. Jesus Rentas noted there was no improvement since Dyllan's previous appointments and that he was not compliant with psychotropics, and he had auditory hallucinations and disorganized thoughts.

44.

On June 21, 2021, Defendant Lara Doregios examined Dyllan and permitted him to be discharged to his home without any treatment plan or instructions to Dyllan's caregivers or family.

45.

On June 21, 2021, at around noon, MacLaren released Dyllan.  Dyllan's release packet noted he was released on parole "Home (parents)."  Dyllan's mother picked him up in a vehicle and was not informed of the acute mental health crisis Dyllan had been experiencing while incarcerated at McLaren, or provided any specific instructions regarding caring for Dyllan.

46.

During the night of June 21 or early morning hours of June 22, 2021, Dyllan Nanoski went into his parents' garage, hanged himself, and died.

47.

After his death, the following notes were found in Dyllan's pocket:

Dyllan to Your Self

Hey if released by 2:30pm on friday slipknot end it Satan didnt uphold the deal. And the aliens around earth fucked you over please end it. If you dont die from suffocation Destroy your brain they Control energy. Kill your self. Destroy yourbrain its fucking Disgusting. The aliens Controlling the simulation wipes your memories, Your Sister Notission and your Brother are indanger its not your fault.

IF you wake up & read this Destroy your brain.

Dyllan it's fucking serious no matter how good it feels Die the night you get out of Mclaren everything is gone Gods want to Kill you, with bugs, torture, & radiation

Hang yourself with the extention cord in your garage.

Finish it.

Page 11 – SECOND AMENDED COMPLAINT

48.

As a result of the actions and inactions of the named Defendants and the State of Oregon

through its Oregon Youth Authority and its agents acting in the course and scope of their

employment, Dyllan's suicidal ideations and acute mental health crisis, exhibited by his

significant auditory hallucinations, his articulations of psycho-physical pain from an unknown

cause, and his expression of his desire to harm himself and others, including making a noose

from a bed sheet, and painting a religious symbol on his floor with blood, Dyllan's suicidal

ideations were allowed to continue unabated and untreated in an acute phase, thus causing

Dyllan to commit suicide on or about June 21, 2021.

49.

Dyllan's beneficiaries, Ms. Danielle Nanoski, his mother, Mr. Joseph Nanoski, his

stepfather, and Mr. Christian Jimenez, his biological father, each of whom make a claim for lost

society, have been bereaved of the love, society, and companionship of their son, thus

sustaining non-economic damages in the amount of $6,000,000.00.

50.

Dyllan's Estate has suffered the form of funeral benefits in the amount of $2,179.00.

51.

The State of Oregon received timely notices pursuant to ORS 30.275.

### FIRST CLAIM FOR RELIEF-WRONGFUL DEATH
#### *Against the State of Oregon*

52.

Plaintiff reincorporates and alleges paragraphs 2-51.

53.

Page 12 – SECOND AMENDED COMPLAINT

The State of Oregon, through OYA and its agents, was negligent in one or more of the following particulars that were a cause of Dyllan's death by failing to prevent Dyllan's suicide, in one or more of the following particulars:

a.    In failing to recognize that Dyllan was dangerous to himself and in need of in-patient psychiatric care and hospitalization prior to his release on June 21, 2021.

b.    In disregarding the danger that Dyllan posed to himself on June 21, 2021.

c.    In failing to treat Dyllan with medication or other mental health therapy to allow him to return safely to the community on or about June 21, 2021.

d.    In failing to discharge Dyllan directly to an in-patient mental health facility on June 21, 2021.

e.    In failing to recognize Dyllan was in a mental health crisis immediately prior to his release on June 21, 2021.

f.    In releasing Dyllan on June 21, 2021, without any treatment plan to address his acute mental health crisis.

g.    In releasing Dyllan to his parents' care on June 21, 2021, while he was in a mental health crisis.

h.    In failing to inform Dyllan's parents that Dyllan was acutely suicidal and/or his mental health had significantly decompensated prior to his release on or about June 21, 2021.

i.    In failing to inform Dyllan's parents that Dyllan was suffering from a mental health crisis immediately upon his release on June 21, 2021.

j.    In failing to take steps to discover the notes referenced in paragraph 47 prior to Dyllan's June 21, 2021, release.

Page 13 – SECOND AMENDED COMPLAINT

k.    In failing to appreciate the danger Dyllan's mental health crisis posed on June 21, 2021.

l.    In failing to provide Dyllan one-to-one supervision as defined in OYA policy II-A-3.2 from April 28, 2021, to June 21, 2021.

m.    In failing to provide Dyllan face-to-face contact with a mental health practitioner at least daily while incarcerated at MacLaren YCF from April 28, 2021, to June 21, 2021.

n.    In failing to train employees and agents working from April 28, 2021, to June 21, 2021, at MacLaren YCF to recognize the behaviors and appearance indicators that require immediate referral to in-patient mental health intervention and care.

o.    In failing to train employees and agents working from April 28, 2021, to June 21, 2021, at MacLaren YCF of the enhanced monitoring and supervision of a Ward in exhibiting a mental health crisis and/or exhibiting indicators of psychosis and/or suicidality.

p.    In failing to train employees and agents working from April 28, 2021, to June 21, 2021, at MacLaren YCF of the referral process to obtain an immediate mental health intervention for a suicidal youth.

q.    In failing to stabilize Dyllan's mental health after May 20, 2021, despite knowing that he was decompensating quickly.

r.    In failing to transfer Dyllan to the Oregon State Hospital or another Community Psychiatric Hospital for admission after May 20, 2021.

s.    In failing to conduct an "intake psychological evaluation" within 21 days of Dyllan's April 28, 2021 arrival at MaClaren YCF.

Page 14 – SECOND AMENDED COMPLAINT

t.      In failing to recognize the signs and symptoms of Dyllan's acute suicidality and
self-harming behavior.

54.

As a result of Defendants' negligence described in the paragraphs above, Dyllan hanged
himself, causing his Estate and beneficiaries to suffer the damages as noted in paragraphs 49
and 50.

55.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF 8th and 14th AMENDMENT-**
**DEPRIVATION OF MENTAL HEALTH SERVICES**
***(Defendants Moshofksy, Doregios, Varner, Jesus-Rentas)***

56.

Plaintiff realleges and incorporates, as though fully set forth herein, all previous
paragraphs above.

57.

As an inmate in custody, Dyllan Nanoski was entitled to due process and to be free from
cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United
States Constitution.  The prohibitions against cruel and unusual punishment apply to youth
correctional conditions and specifically mandate the right to timely mental health care.

58.

Despite Dyllan's request to be violated on parole because he reported that he posed a
danger to himself and others,  Dyllan's request for medication to stabilize his decompensating
mental health, Dyllan's request to be admitted to the State Hospital, and OYA's staff's
observations of Dyllan's rapidly decompensating mental health, Defendants Moshofksy,
Doregios, Varner, and Dr. Jesus-Rentas denied and continued to deny Dyllan medically

Page 15 – SECOND AMENDED COMPLAINT

necessary care, including in-patient treatment at a mental health facility and/or regular medication management, and/or psychotherapy to stabilize his rapidly deteriorating mental health.

59.

Defendants Moshofksy, Doregios, Varner, and Dr. Jesus-Rentas exhibited deliberate indifference toward Dyllan's serious medical needs in violation of the Eighth Amendment by denying him necessary medical and mental health care, including a complete psychological assessment, in-patient mental health care,  psychotropic medication, and/or psycho-therapy because they knew that Dyllan faced a substantial risk of serious harm to his health and disregarded that risk by failing to take reasonable measures to abate the harm.

60.

A reasonable mental health provider in a correctional setting would have recognized the high degree of risk and danger of self-harm and suicide in which Defendants Moshofksy, Doregios, Varner, and/or Dr. Jesus-Rentas's actions and inactions placed Dyllan.

61.

As a direct result of the deliberate indifference of Defendants Moshofksy, Doregios, Varner, and/or Dr. Jesus-Rentas to Dyllan's serious mental health needs, Dyllan died by hanging. Dyllan's beneficiaries have been denied the love, society and companionship of their son and are entitled to compensatory damages in the sum of $3,000,000.00.

62.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF 8th and 14th AMENDMENT**
*Depravation of Continued Mental Health Treatment*
*Against Berger, Malone, and Williams*

63.

Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

64.

Dyllan Nanoski had a special relationship with Defendants Berger, Malone, and Williams due to him being on Parole after his discharge from MacLaren and was entitled to due process and to be free from cruel and unusual punishment pursuant to the Eighth and/or Fourteenth Amendments to the United States Constitution.  The prohibitions pursuant to the Eighth and/or Fourteenth Amendments apply to medical and mental health care and extend once an inmate or ward is released from confinement.

65.

Despite the facts noted in paragraphs 17-45 above, Defendants Berger, Malone, and Williams approved the release of the acutely mentally ill and suicidal Dyllan without any instructions, warnings regarding his mental health, or any immediate follow-up appointments to address Dyllan's deteriorated mental health, and before medication had stabilized his acute mental health issues and suicidal ideations.

66.

Defendants Berger, Malone, and Williams exhibited deliberate indifference toward Dyllan's serious medical needs in violation of the Eighth Amendment by denying him necessary medical and mental health care upon his release from McLaren because they knew that Dyllan faced a substantial risk of serious harm to his health and disregarded that risk by failing to take reasonable action, or any measures to abate the harm posed by his decompensated mental health and acute psychosis which included self-harm and suicidal behavior.

Page 17 – SECOND AMENDED COMPLAINT

67.

A reasonable youth probation officer would have recognized the high degree of risk and danger of self-harm and suicide in which Defendants Malone and Williams's actions and inactions placed Dyllan.  And, a reasonable superintendent of a youth correctional facility would have recognized the high degree of risk and danger of self-harm and suicide in which Defendant Berger, Malone, and William's actions and inactions placed Dyllan.

68.

As a direct result of the deliberate indifference of Defendants Berger, Malone, and Williams to Dyllan's serious mental health needs, Dyllan died by hanging.  Dyllan's beneficiaries have been denied the love, society and companionship of their son and are entitled to compensatory damages as noted in paragraph 61.

69.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE 8TH AND 14th AMENDMENT**
***Monnell Claims Against Defendant Berger***

70.

Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

71.

At all times material Defendant Berger supervised and implemented policy at MacLaren Youth Correctional Facility in which Dyllan was incarcerated.  During this time, MacLaren lacked adequate mental health staffing, supervision, and protocols to protect inmates at risk of self-harm, decompensating mental health, or suicide.

72.

Page 18 – SECOND AMENDED COMPLAINT

At all times material Defendant Berger knew of and was deliberately indifferent to a the fact that OYA's training and staffing practices created a substantial and immediate risk that the serious mental health needs of youth in their custody would go untreated or addressed and that placed youth in their custody at a substantial risk of harm.

73.

The moving forces that resulted in the deprivation of Dyllan's Eighth Amendment and/or Fourteenth Amendment rights were the following policies, customs, or practices:

    a.    A policy, custom, or practice of using MacLaren Youth Correctional Facility rather than an in-patient mental health facility to house youth exhibiting acute psychosis and/or suicidal ideations.

    b.    A policy, custom, or practice of refusing to refer mental health patients to the Oregon State Hospital and/or community in-patient psychiatric facilities.

    c.    A policy, custom, or practice of accepting youth into custody without the ability to provide adequate mental health care.

    d.    A policy, custom, or practice of not requiring staff responsible for suicide prevention to read or otherwise be specifically informed of medical and mental health information essential to protect the health and safety of youth confined at MacLaren.

    e.    A policy, custom, or practice of failing to meet widely accepted community standards of care regarding regard to behavior management and suicide prevention services for youth housed at MacLaren.

    f.    In failing to have a policy in place to discover suicidal ideations of youth exhibiting severe mental health issues.

g. In failing to have a policy in place to ensure persons in an acute mental health crisis or psychosis are not released without proper safeguards and oversight in place.

74.

As a direct result of the deliberate indifference of Defendant Berger to Dyllan's serious mental health needs, Dyllan died by hanging. Dyllan's beneficiaries have been denied the love, society and companionship of their son and are entitled to compensatory damages as noted in paragraph 61.

75.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION 14th AMENDMENT**
*State Created Danger Against Malone, Williams, & Berger*

76.

Plaintiff incorporates and alleges the paragraphs noted above.

77.

As a ward of the State, Dyllan had a Fourteenth Amendment right to Due Process to confer governmental aid, and that imposed a duty on the State to protect Dyllan.

78.

Despite the facts noted in paragraphs 17-45 above, Defendants Malone, Williams, and Berger recommended and approved the release of the acutely mentally ill and suicidal Dyllan to Dyllan's parent's residence without any instructions, warnings regarding his mental health, or any immediate follow-up appointments to address Dyllan's decompensated mental health, and before medication had stabilized his acute mental health issues and suicidal ideations.

79.

Page 20 – SECOND AMENDED COMPLAINT

Despite the facts noted in paragraphs 17-45 above, Defendants Malone, Williams, and Berger recommended and approved release of Dyllan without any safeguards or oversight in place which placed Dyllan in danger by acting with deliberate indifference to the known and obvious danger of Dyllan's acute mental health needs and suicidal ideations.

80.

Defendants Malone and Williams also violated Dyllan's 14th Amendment rights by communicating to Dyllan's mother that Dyllan was unable to leave the State to go to an in-patient mental health care facility until the Judge terminated Dyllan's Parole, or Dyllan needed judicial approval to leave the State to enter inpatient treatment. This was contrary to the law and deprived Dyllan of the opportunity to immediately transition to the in-patient facility.

81.

Defendants Malone, Williams, and Berger's actions in the paragraphs noted above in this count created or exposed Dyllan to a danger of suicide and self-harm that he would not have otherwise faced from his acute mental health issues and acute suicidality.

82.

Defendants Malone, and Williams acted with deliberate indifference to Dyllan's acute mental health issues and suicidality by informing Dyllan's family that Dyllan could not enter in-patient treatment out of State and failing to take any steps to ensure Dyllan's immediate acute mental health needs were being addressed prior to recommending Dyllan be discharged from MacLaren when there were not adequate mental health safeguards or oversight in place.

83.

As a direct result of the deliberate indifference of Defendants Malone, Williams, and Berger to Dyllan's serious mental health needs, Dyllan died by hanging. Dyllan's beneficiaries

Page 21 – SECOND AMENDED COMPLAINT

have been denied the love, society and companionship of their son and are entitled to compensatory damages, as noted in paragraph 61.

84.

Plaintiff is entitled to his attorney fees and costs as a prevailing party pursuant to 42 U.S.C. 1988 for Plaintiff's Second, Third, Fourth, and Fifth Claims for Relief above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

On the FIRST Claim for Relief for Wrongful Death, Plaintiff seeks from Defendant:

     a. Non-Economic damages in the amount of $6,000,000.00;

     b. Pecuniary losses to the Estate in the amount of $2,179.00; and

     c. Costs and disbursements incurred herein.

WHEREFORE, Plaintiff prays for judgment as follows:

On the SECOND, THIRD, FOURTH, and FIFTH Claim for Relief for Constitutional Violations, Plaintiff seeks from the individually named Defendants:

     a. Non-Economic damages in the amount of $3,000,000.00;

     b. Attorney fees under 42 U.S.C. 1988; and

     **c.** Costs and disbursements incurred herein.

Dated:  February 6, 2024.

ROSS LAW LLC.

s/ Jeremiah Ross_____
Jeremiah Ross, OSB 105980
Attorney for Plaintiff
Phone: (503) 224-1658
E-mail: ross@rosslawllc.com

**DEMAND FOR JURY TRIAL**

Page 22 – SECOND AMENDED COMPLAINT