**Jeremiah Ross, OSB No. 105980**
Email: ross@rosslawllc.com
Ross Law LLC
50 SW Pine St. Suite 402
Portland, Oregon 97204
Phone: (503) 224-1658
Fax: (888) 499-2575

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| PAUL GALM, personal representative for the estate of DYLLAN NANOSKI, <br><br> Plaintiff, <br><br> v. <br><br> STATE OF OREGON, by and through the Oregon Youth Authority; JOHN MALONE, in his individual capacity; SHANNON MOSHOFSKY in her individual capacity; STACEY VARNER in her individual capacity; BRENDAN DUMMIGAN as Guardian *ad litem* for GILBERTO DE JESUS-RENTAS, in his individual capacity; DANIEL BERGER, in his official and individual capacity; TARA WILLIAMS in her individual capacity; and LARA DOREGIOS, in her individual capacity. <br><br> Defendants. | Case No. 3:23-cv-00962-SB <br><br> THIRD AMENDED COMPLAINT (Wrongful Death and Violation of Civil Rights) <br><br> JURY TRIAL DEMANDED |

Paul Galm, personal representative of the Estate of Dyllan Nanoski, alleges as follows:

1.

This case is not subject to mandatory arbitration due to the amount of the prayer.

Page 1 – THIRD AMENDED COMPLAINT

2.

The Oregon Youth Authority ("OYA") is a duly authorized agency of Defendant State of Oregon that is responsible for the delivery and administration of programs and services to children and young adults to hold youth accountable and provide them with opportunities for reformation through treatment, education, and other guidance.  At all times material, OYA employed or otherwise engaged as agents to provide Dyllan Nanoski treatment, education, and guidance.  These agents included John Malone, who was a juvenile parole and probation officer "JPPO" and his supervisor Tara Williams.

3.

Defendant John Malone was a JPPO for the State of Oregon and at all times was acting under color of state law and within the course and scope of his employment and had the authority to recommend paroling wards or terminating parole.  He is named individually.

4.

Defendant Tara Williams was a JPPO supervisor for the State of Oregon. She at all times material supervised JPPO Malone. She had authority to revoke parole and recommend paroling wards from MacLaren and/or terminating parole.  At all times she was acting under color of state law and within the course and scope of her employment.  She is named individually.

5.

Defendant Daniel (also known as "DAN") Berger ("Berger") was at all times relevant, the Superintendent of MacLaren Youth Correctional Facility (MacLaren).  Berger was responsible for the safety of wards housed at MacLaren and had the authority to approve the parole of wards from MacLaren.  Berger is named in his official and individual capacity.

Page 2 – THIRD AMENDED COMPLAINT

6.

At all times material, Defendant Shannon Moshofsky was a Qualified Mental Health Provider at MacLaren Youth Correctional Facility and at all times was acting under color of state law and within the course and scope of her employment and is sued in her individual capacity.

7.

Defendant Lara Doregios was a medical or mental health provider at MacLaren Youth Correctional Facility and at all times was acting under color of state law and within the course and scope of her employment. She is being sued in her individual capacity.

8.

Defendant Gilberto De Jesus-Rentas was a medical provider at MacLaren Youth Correctional Facility and at all times was acting under color of state law and within the course and scope of his employment. He is being sued in his individual capacity through his Guardian *ad litem* in this matter, Brendan Dummigan.

9.

Defendant Stacey Varner was a medical provider at MacLaren Youth Correctional Facility and at all times was acting under color of state law and within the course and scope of her employment. She is being sued in her individual capacity.

10.

OYA states that while your child is with the Oregon Youth Authority, "We will make sure their needs are met. This includes medical care, dental care, and mental health care."

11.

OYA operates the MacLaren Youth Correctional Facility "MacLaren" located in Woodburn, Oregon.

12.

At all times material herein, Plaintiff, Paul Galm, was duly appointed, and qualified to act as, the Personal Representative of the Estate of Dyllan Nanoski (DOB January 13, 2001), deceased (hereinafter referred to as "Dyllan").

13.

In or about September 20, 2019, the 18-year-old Dyllan was placed in the Oregon State Hospital to restore his mental competency to address an OYA parole violation.

14.

Dyllan was treated for significant mental health issues while at the Oregon State Hospital.

15.

In the Fall or Winter of 2019, Dyllan was released from the State Hospital and sent to MacLaren Youth Facility where he was subjected to a psychological intake assessment.  The assessment noted prior suicide attempts, and years of auditory hallucinations that were getting worse.  The State's psychologist "strongly recommended" placement in a locked mental health facility to treat "a serious chronic mental health disability."

16.

In or around April 2020, Dyllan was released from MacLaren to a group home where he violated parole and was sent back to MacLaren Youth Correctional Facility.

Page 4 – THIRD AMENDED COMPLAINT

17.

In or around February 2021, Dyllan was released from MacLaren to his mother and father's house in Corvallis, Oregon.  John Malone was assigned to be his parole officer.

18.

Immediately after Dyllan's release to his parent's home, Dyllan's mother and father noticed Dyllan exhibiting the unusual behavior of him isolating himself in his room and constantly pacing back and forth while talking to himself.

19.

In April 2021, Dyllan was still under the supervision of JPPO Malone. JPPO Malone was informed that Dyllan was not receiving mental health services at the time.

20.

In April 2021 Dyllan absconded from Oregon.

21.

On April 13, 2021, Dyllan was apprehended out of the State of Oregon.

22.

On April 21, 2021, the State of Oregon arranged for Dyllan to be flown to Portland, Oregon where he was met by JPPO Malone.

23.

On April 21, 2021, JPPO Malone drove Dyllan from Portland, Oregon to Dyllan's mother and father's home in Corvallis, Oregon, and released Dyllan.

Page 5 – THIRD AMENDED COMPLAINT

24.

Dyllan's parents immediately observed Dyllan exhibiting unusual behavior.  Dyllan

informed his parents he had left the State of Oregon to kill himself and that he had a soft-shell

crab in his neck that needed to be removed.

25.

Dyllan was taken to a local hospital and noted that he wanted to go to the Oregon State

Hospital, but he was informed there was no bed space or any other available options.

26.

On April 27, 2021, Dyllan contacted JPPO Malone to self-report that he had been using

narcotics and he feared he might harm himself or his family.  Dyllan called JPPO Malone later

that day and informed JPPO Malone he wanted to go to the Oregon State Hospital.

27.

On April 27, 2021, JPPO Malone then initiated revoking Dyllan's parole because

"Dyllan was a risk to himself as well as the community.  OYA requested his parole be revoked

back to MacLaren YCF."

28.

On April 28, 2021, Dyllan admitted the parole violation and was sent to MacLaren.

MacLaren's staff conducted an assessment and noted that Dyllan's behavior, affect, and mood

were normal.  Dyllan noted that he had a mental health crisis and was prescribed various mental

health medications, but MacLaren staff did not order any medications for him at that time.

29.

On April 28, 2021, Dyllan's mother began to search for in-patient mental health facilities throughout the West Coast that could immediately accept Dyllan. Ms. Nanoski located an out-of-state in-patient mental health facility that had space for Dyllan.

30.

On May 5, 2021, Dyllan's mother informed JPPO Malone that she had arranged for Dyllan to enter a residential mental health treatment facility in California.

31.

On May 7, 2021, Dyllan informed a mental health provider he needed to go to the Oregon State Hospital and was hearing voices. Maclaren staff noted Dyllan was pacing back and forth and was "acting strange" and punching himself in the face. Dyllan was then screened by Dr. Gilberto de Jesus-Rentas, MD, who was aware of Dyllan's previous suicide attempts and acute mental health issues. Dr. Jesus-Rentas was also informed that Dyllan was not taking his prescribed medication. Dr. Jesus-Rentas then prescribed Dyllan Zyprexa.

32.

On or about May 11, 2021, Dyllan sent a Health Care Request form to OYA noting he needed "Emergency mental health appointment please. I sincerely am sick and need to go to state Hospital." And that he had the problem for years and had been taking psychological medications. OYA then referred him to a mental health provider.

33.

On May 12, 2021, Dyllan was found pacing back and forth speaking with himself and making odd vocalizations. Stacey Varner noted his mental health is "slipping daily." Dyllan informed Defendant Stacey Varner and Shannon Moshofsky he was suffering from paranoia,

voices, and a great deal of distress.  Dyllan requested again to go to the Oregon State Hospital
and informed them that his symptoms were "bad."  Stacey Varner informed him a priority
referral would be submitted, and Dyllan indicated he was relieved.

34.

A referral to the Oregon State Hospital was never made on Dyllan's behalf at any time
from April 2021 until June 22, 2021.

35.

On May 12, 2021, Stacey Varner and Shannon Moshofsky reviewed a note that was found
in Dyllan's room. The notes stated, "Please Die. Dyllan you need to kill yourself. You have not
memories left. Its literally an Alien simulation they literally followed you stole your clothes your
cigarettes and your friends. THERES NOTHING LEFT."   The letter continues "your whole
family is in Danger you need to kill yourself microwave in the bath, flare Gun, Antifreeeze,
Windex, your Olanzapine, your bertatrapine, use a building's roof top. Soon they want to kidnap
you and give you torture and the worlds most violent death. WAKE UP THE VOICES ARE NOT
FRIENDS DIE PLEASE THEY WANT TO HURT NATESSA." The note continues "Don't
Sleep! Don't listen to the Fucking Aliens They're Really Fucking Sick! The Whol Worlds Out to
Get You! Anyone could Be a spy!..." The letter was put in Dyllan's Electronic Medical Record
where it could be viewed by Dr. De Jesus Rentas and Lori Doregios among others.  Dyllan's
parents were never made aware of the letter.

36.

From April 2021 to June 2021 Dyllan continued to remain on the lowest suicide risk level
despite the letter and his conduct alleged in this Complaint.

Page 8 – THIRD AMENDED COMPLAINT

37.

On May 20, 2021, Dyllan was unable to sleep and constantly disturbed staff and other confined youth with his loud outbursts and hitting of walls.

38.

On May 20, 2021, Shannon Moshofsky communicated to the Oregon State Hospital that she believed Dyllan Nanoski would benefit from placement and stabilization at the hospital. She noted that she had never made a referral to OSH and was hoping to get insight on how to begin the process. She also communicated to the Oregon State Hospital that "This young person is decompensating quickly, and I am concerned about the continued deterioration of his mental health."

39.

On May 20, 2021, Shannon Moshofsky communicated to Defendants Berger and Dr. De-Jesus Rentas that Dyllan needed to be referred to the Oregon State Hospital. She also asked for instructions to accomplish because she had never done a State Hospital referral.  Neither Defendant Berger, nor De Jesus Rentas responded to her request for direction.

40.

On May 20, 2021, Shannon Moshofsky communicated to OYA staff that Dyllan should be housed in the isolation and intervention unit at night due to his loud vocal responses to internal stimuli keeping other adjudicated youth awake.

41.

On May 24, 2021, the Oregon Youth Authority conducted a multi-disciplinary team meeting with Dyllan. Dyllan's parents were not invited to the meeting.

Page 9 – THIRD AMENDED COMPLAINT

42.

On May 25, 2021, Dyllan was found drawing a religious symbol on the floor in his own blood.

43.

On May 27, 2021, Dr. Jesus Rentas was Dyllan's sole treating psychiatrist and communicated with Dyllan.  Dyllan reported ongoing auditory hallucinations, difficulty concentrating, constantly moving, had disorganized thought and speech, his insight was poor, and his judgment was poor. Later that day, Shannon Moshofsky emailed Dr. Jesus Rentas noting that she had concerns regarding contradictions with Dyllan's representations to Dr Jesus Rentas that he was able to sleep, and his manic symptoms were subsiding. Shannon Moshofsky informed Dr. Jesus Rentas that Dyllan was not sleeping and needed to be placed in the Isolation and Intervention Unit because of the disturbance he was causing. She also articulated that he demonstrates increased manic symptoms and is not taking his medication as directed. Dr. De Jesus Rentas did not communicate with Ms. Moshofsky in anyway or take any actions based on the new information provided.

44.

On May 31, 2021 Dyllan was found making a rope out of his bed sheets.

45.

On June 5, 2021, Dyllan was found with a noose made from a bed sheet in his room at MacLaren.

46.

Ms. Nanoski and JPPO Malone communicated back and forth regarding having Dyllan released directly from MacLaren to the residential facility.  On June 10, 2021, Ms. Nanoski

Page 10 – THIRD AMENDED COMPLAINT

asked JPPO Malone what the status of the release order was, so that Dyllan could be released directly to an out-of-state in-patient mental health treatment facility. Tara Williams and John Malone were aware of Dyllan's deteriorating mental health.  John Malone then indicated to Ms. Nanoski that Dyllan had to be off parole to enter the out-of-state in-patient facility or get judicial permission to leave the state to enter the in-patient facility.

47.

On June 9, 2021, Shannon Moshofsky emailed medical staff at MacLaren regarding a letter was located in Dyllan's room. The letter noted, "The gods will literally replace your thoughts. It's illuminati bullshit. Don't eat. Keep drinking water. Never eat on planet earth again. They will hurt you more if you do. Miralax to the max. Laugh at the monsters all you want but don't let them distract you." Lori Doregios received the email and forwarded it to Dr. De Jesus Rentas. Neither Defendant Doregios nor Defendant De Jesus-Rentas took any actions to address Defendant Moshofsky's concerns in the email. Dyllan lost approximately 50lb during his incarceration at MacLaren from April 2021 to June 2021.

48.

On June 14, 2021, Dyllan again informed Defendant Shannon Moshofsky that he desired to be sent to the Oregon State Hospital.

49.

On or about June 17, 2021, John Malone drafted a Parole Agreement noting the terms upon which Dyllan would be released. The Parole agreement was signed by Dyllan and someone from the Oregon Youth Authority on June 17, 2021. There was not any information noted in the space for mental health treatment programs or providers noted in the Parole

Agreement, but John Malone required Dyllan to submit job applications weekly as a condition

of his parole.  Despite signing the agreement, Dyllan continued to be housed in MacLaren.

50.

On June 18, 2021, JPPO Malone communicated with Danielle Nanoski to ask her what

time she could pick Dyllan up on June 21, 2021.  Ms. Nanoski asked if Dyllan would still be on

Parole. John Malone informed Ms. Nanoski that Dyllan would be on parole until he "got word

that the judge has signed the order" to terminate parole.  Ms. Nanoski agreed to pick Dyllan up

at MacLaren YCF.

51.

On June 20, 2021, MacLaren drafted a "Summary of Discharge" for Dyllan, noting

schizophrenia was a current acute condition and that Mental Health follow-up was due "as soon

as possible."

52.

On June 21, 2021, at 00:50 in the morning Dr. Gilberto De Jesus Rentas, MD entered

into Dyllan's chart and noted Dyllan's June 14, 2021 request to go to the Oregon State Hospital

and that his last face-to-face visit with a psychiatrist was May 27, 2021 where Dyllan refused to

discuss his day to day activities and concerns regarding his psychotic symptoms. The May 27,

2021 report noted that Dyllan denied having issues sleeping despite staff contradicting those

statements.  The records reviewed also revealed that Dyllan was not regularly taking the

prescribed lithium that was intended to stabilize and minimize the effects of schizoaffective

disorder.  Dr. Jesus Rentas was also aware that Defendant Moshofksy reported that Dyllan was

responding to internal stimuli, paranoia, and delusional thinking.  Dr. Jesus Rentas also

observed that Dyllan was unable to stay still, constantly pacing, talking, or mumbling to

Page 12 – THIRD AMENDED COMPLAINT

himself, intermittently laughing, responding to internal stimuli, had disorganized thought

process, poor judgment, poor insight, and was positive for auditory hallucinations.  Dr. Jesus

Rentas noted there was no improvement since Dyllan's previous appointments and that he was

not compliant with psychotropics, and he had auditory hallucinations and disorganized

thoughts. Dr. Jesus Rentas then noted that Dyllan was unable to care for himself due to his

ongoing psychosis.

53.

On June 21, 2021, Defendant Lara Doregios examined Dyllan and permitted him to be

discharged to his home without any treatment plan or instructions to Dyllan's caregivers or

family. Defendants John Malone, Tara Williams, and Daniel Berger all also agreed to parole

Dyllan without any treatment plan or instructions to Dyllan's caregivers or family or alert him

to Dyllan's mental health decompensation he experienced from April 2021 to June 21, 2021.

54.

On June 21, 2021, at around noon, MacLaren released Dyllan.  Dyllan's release packet

noted he was released on parole "Home (parents)."  Dyllan's mother picked him up in a vehicle

and was not informed of the acute mental health crisis Dyllan had been experiencing while

incarcerated at MacLaren or provided any specific instructions regarding caring for Dyllan.

55.

From April 2021 until June 21, 2021, MacLaren staff questioned whether Dyllan was

legally competent to make decisions while he was incarcerated at MacLaren.

56 .

During the night of June 21 or early morning hours of June 22, 2021, Dyllan Nanoski

went into his parents' garage, hanged himself, and died.

Page 13 – THIRD AMENDED COMPLAINT

57.

After his death, the following notes were found in Dyllan's pocket:

58.

As a result of the actions and inactions of the named Defendants and the State of Oregon through its Oregon Youth Authority and its agents acting in the course and scope of their employment, Dyllan's suicidal ideations and acute mental health crisis exhibited by his significant auditory hallucinations, his articulations of psycho-physical pain from an unknown cause, and his expression of his desire to harm himself and others, including making a noose from a bed sheet and painting a religious symbol on his floor with blood. Dyllan's suicidal ideations were allowed to continue unabated and untreated in an acute phase, thus causing Dyllan to commit suicide on or about June 21, 2021.

59.

Dyllan's beneficiaries, Ms. Danielle Nanoski, his mother, Mr. Joseph Nanoski, his stepfather, and Mr. Christian Jimenez, his biological father, each of whom make a claim for lost society, have been bereaved of the love, society, and companionship of their son, thus sustaining non-economic damages in the amount of $6,000,000.00.

60.

Dyllan's Estate has suffered the form of funeral benefits in the amount of $2,179.00.

61.

The State of Oregon received timely notices pursuant to ORS 30.275.

### FIRST CLAIM FOR RELIEF-WRONGFUL DEATH
### *Against the State of Oregon*

62.

Plaintiff reincorporates and alleges paragraphs 2-61.

Page 15 – THIRD AMENDED COMPLAINT

63.

The State of Oregon, through OYA and its agents, was negligent in one or more of the following particulars that were a cause of Dyllan's death by failing to prevent Dyllan's suicide, in one or more of the following particulars:

    a.    In failing to recognize that Dyllan was dangerous to himself and in need of in-patient psychiatric care and hospitalization prior to his release on June 21, 2021.

    b.    In disregarding the danger that Dyllan posed to himself on June 21, 2021.

    c.    In discharging Dyllan on Parole while he was unable to care for himself.

    d.    In failing to discharge Dyllan directly to an in-patient mental health facility on June 21, 2021.

    e.    In failing to recognize Dyllan was in a mental health crisis immediately prior to his release on June 21, 2021.

    f.    In releasing Dyllan on June 21, 2021, without any treatment plan to address his acute mental health crisis.

    g.    In releasing Dyllan to his parents' home on June 21, 2021, while he was in a mental health crisis.

    h.    In failing to inform Dyllan's parents that Dyllan was acutely suicidal and/or his mental health had significantly decompensated prior to his release on or about June 21, 2021.

    i.    In failing to inform Dyllan's parents that Dyllan was suffering from a mental health crisis and unable to care for himself immediately upon his release on June 21, 2021.

j.      In failing to take steps to discover the notes referenced in paragraphs 35 and 47 prior to Dyllan's June 21, 2021, release.

k.      In failing to appreciate the danger Dyllan's mental health crisis posed in April, May, and June of 2021.

l.      In having Dyllan's Parole Agreement  for his June 2021 parole drafted prior to a final psychiatric evaluation .

m.      In failing to provide Dyllan face-to-face contact with a mental health practitioner at least daily while incarcerated at MacLaren YCF from April 28, 2021, to June 21, 2021.

n.      In failing to train employees and agents working from April 28, 2021, to June 21, 2021, at MacLaren YCF to recognize the behaviors and appearance indicators that require immediate referral to in-patient mental health intervention and care.

o.      In failing to train employees and agents working from April 28, 2021, to June 21, 2021, at MacLaren YCF of the referral process for the Oregon State Hospital.

p.      In failing to properly supervise employees and agents working from April 28, 2021, to June 21, 2021, at MacLaren YCF of the referral process for the Oregon State Hospital.

q.      In failing to stabilize Dyllan's mental health after May 12, 2021, despite knowing that he was decompensating quickly.

r.      In failing to submit a referral to transfer Dyllan to the Oregon State Hospital or another Community Psychiatric Hospital for admission after May 7, 2021.

s.      In delaying the process to transfer Dyllan to the Oregon State Hospital or another Community Psychiatric Hospital for admission after May 12, 2021.

Page 17 – THIRD AMENDED COMPLAINT

t.    In failing to coordinate Dyllan's Parole terms with Shannon Moshofsky, Dr. De Jesus Rentas, Daniel Berger.

u.    In housing Dyllan in the Intervention Unit in May and June of 2021 due to his psychiatric conditions;

v.    In failing to recognize the signs and symptoms of Dyllan's acute suicidality and self-harming behavior.

64.

As a result of Defendants' negligence described in the paragraphs above, Dyllan hanged himself, causing his Estate and beneficiaries to suffer the damages as noted in paragraphs 59 and 60.

65.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF 8th and 14th AMENDMENT-**
**DEPRIVATION OF MENTAL HEALTH SERVICES**
**(*Defendants Moshofksy, Doregios, Varner, Jesus-Rentas, Berger*)**

66.

Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

67.

As an inmate in custody, Dyllan Nanoski was entitled to due process and to be free from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.  The prohibitions against cruel and unusual punishment apply to youth correctional conditions and specifically mandate the right to timely mental health care.

68.

Page 18 – THIRD AMENDED COMPLAINT

Despite Dyllan's request to be violated on parole because he reported that he posed a danger to himself and others,  Dyllan's request for medication to stabilize his decompensating mental health, Dyllan's request to be admitted to the State Hospital, and OYA's staff's observations of Dyllan's rapidly decompensating mental health, Defendants Moshofksy, Doregios, Varner, Dr. Jesus-Rentas, Berger denied and continued to deny Dyllan medically necessary care, including in-patient treatment at a mental health facility and/or regular medication management, and/or psychotherapy to stabilize his rapidly deteriorating mental health.

69.

Defendants Moshofksy, Doregios, Varner, Dr. Jesus-Rentas, and Berger exhibited deliberate indifference toward Dyllan's serious medical needs in violation of the Eighth Amendment by denying him necessary medical and mental health care, including a complete psychological assessment, a referral to in-patient mental health care, in-patient mental health care, psychotropic medication, and/or psycho-therapy because they knew that Dyllan faced a substantial risk of serious harm to his health and disregarded that risk by failing to take reasonable measures to abate the harm.

70.

A reasonable mental health provider in a correctional setting would have recognized the high degree of risk and danger of self-harm and suicide in which Defendants Moshofksy, Doregios, Varner, and/or Dr. Jesus-Rentas's actions and inactions placed Dyllan.

71.

As a direct result of the deliberate indifference of Defendants Moshofksy, Doregios, Varner, Dr. Jesus-Rentas,and or Berger to Dyllan's serious mental health needs, mental health

needlessly decompensated and the Estate is entitled to compensatory damages and punitive damages in an amount to be proven at trial ..

72.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF 8th and 14th AMENDMENT**
*Depravation of Continued Mental Health Treatment*
*Against Berger, Malone, and Williams*

73.

Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

74.

Dyllan Nanoski had a special relationship with Defendants Berger, Malone, and Williams due to him being on Parole after his discharge from MacLaren and was entitled to due process and to be free from cruel and unusual punishment pursuant to the Eighth and/or Fourteenth Amendments to the United States Constitution. The prohibitions pursuant to the Eighth and/or Fourteenth Amendments apply to medical and mental health care and extend once an inmate or ward is released from confinement.

75.

Despite the facts noted in paragraphs 17-54 above, Defendants Berger, Malone, and Williams approved the release of the acutely mentally ill and suicidal Dyllan without any instructions, warnings regarding his mental health, or any immediate follow-up appointments to address Dyllan's deteriorated mental health, and before medication had stabilized his acute mental health issues and suicidal ideations.

76.

Page 20 – THIRD AMENDED COMPLAINT

Defendants Berger, Malone, and Williams exhibited deliberate indifference toward Dyllan's serious medical needs in violation of the Eighth Amendment by denying him necessary medical and mental health care upon his release from McLaren because they knew that Dyllan faced a substantial risk of serious harm to his health and disregarded that risk by failing to take reasonable action, or any measures to abate the harm posed by his decompensated mental health and acute psychosis which included self-harm and suicidal behavior.

77.

A reasonable youth probation officer would have recognized the high degree of risk and danger of self-harm and suicide in which Defendants Malone and Williams's actions and inactions placed Dyllan.  A reasonable superintendent of a youth correctional facility would have recognized the high degree of risk and danger of self-harm and suicide in which Defendant Berger, Malone, and William's actions and inactions placed Dyllan.

78.

As a direct result of the deliberate indifference of Defendants Berger, Malone, and Williams to Dyllan's serious mental health needs, Dyllan's mental health needlessly decompensated and/or he hanged himself.  As result, Dyllan's Estate is entitled to compensatory damages and punitive damages in an amount to be proven at trial. .

79.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE 8TH AND 14th AMENDMENT
### *Supervisor Liability Against Defendant Berger*

80.

Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

Page 21 – THIRD AMENDED COMPLAINT

81.

At all times Defendant Berger material supervised Shannon Moshofsky at MacLaren Youth Correctional Facility in which Dyllan was incarcerated. On May 20, 2024 Defendant Berger learned that Dyllan needed to be referred to the Oregon State Hospital to receive mental health care, yet Shannon Moshofsky was unaware of the process. Defendant Berger failed to respond or take action to ensure Dyllan's referral to the State Hospital was submitted.

82.

Defendant Berger's actions set in motion a series of acts by Shannon Moshofsky which deprived Dyllan subsequent Mental Health Care treatment including a referral to the Oregon State Hospital. Defendant Berger was aware of Shannon Moshofsky' s inability to provide Dyllan with necessary mental health referrals resulted in deliberate indifference and a deprivation of Dyllan's Eighth Amendment Right to mental health treatment.

83.

As a direct result of the deliberate indifference of Defendant Berger to Dyllan's serious mental health needs, Dyllan's mental health needlessly decompensated.. As result, Dyllan's Estate is entitled to compensatory damages and punitive damages in an amount to be proven at trial.

84.

### FIFTH CLAIM FOR RELIEF
### VIOLATION 14th AMENDMENT
*State Created Danger Against Malone, Williams, & Berger*

85.

Page 22 – THIRD AMENDED COMPLAINT

Plaintiff incorporates and alleges the paragraphs noted above.

86.

As a ward of the State, Dyllan had a Fourteenth Amendment right to Due Process to confer governmental aid, and that imposed a duty on the State to protect Dyllan.

87.

Despite the facts noted in paragraphs 17-54 above, Defendants Malone, Williams, and Berger recommended and approved the release of the acutely mentally ill and suicidal Dyllan to Dyllan's parent's residence without any instructions, warnings regarding his mental health, or any immediate follow-up appointments to address Dyllan's decompensated mental health, and before medication had stabilized his acute mental health issues and suicidal ideations.

88.

Despite the facts noted in paragraphs 17-54 above, Defendants Malone, Williams, and Berger recommended and approved release of Dyllan without any safeguards or oversight in place which placed Dyllan in danger by acting with deliberate indifference to the known and obvious danger of Dyllan's acute mental health needs and suicidal ideations.

89.

Defendants Malone and Williams also violated Dyllan's 14th Amendment rights by communicating to Dyllan's mother that Dyllan was unable to leave the State to go to an in-patient mental health care facility until the Judge terminated Dyllan's Parole, or Dyllan needed judicial approval to leave the State to enter inpatient treatment.  This was contrary to the law and deprived Dyllan of the opportunity to immediately transition to the in-patient facility.

90.

Defendants Malone, Williams, and Berger's actions in the paragraphs noted above in this count created or exposed Dyllan to a danger of suicide and self-harm that he would not have otherwise faced from his acute mental health issues and acute suicidality.

91.

Defendants Malone and Williams acted with deliberate indifference to Dyllan's acute mental health issues and suicidality by informing Dyllan's family that Dyllan could not enter in-patient treatment out of State and failing to take any steps to ensure Dyllan's immediate acute mental health needs were being addressed prior to recommending Dyllan be discharged from MacLaren when there were not adequate mental health safeguards or oversight in place.

92.

As a direct result of the deliberate indifference of Defendants Malone, Williams, and Berger to Dyllan's serious mental health needs, Dyllan's mental health decompensated.  As result Dyllan's Estate is entitled to compensatory damages and punitive damages in an amount to be proven at trial.

93.

Plaintiff is entitled to his attorney fees and costs as a prevailing party pursuant to 42 U.S.C. 1988 for Plaintiff's Second, Third, Fourth, and Fifth Claims for Relief above.

**SIXTH CLAIM FOR RELIEF**
Abuse of a Vulnerable Person – ORS 124.105
*Against the State of Oregon*
94.

Plaintiff realleges and incorporate herein paragraphs 1-62.

95.

Page 24 – THIRD AMENDED COMPLAINT

Dyllan was at all relevant times vulnerable and entitled to the protection of ORS 124.100 et seq., because he incapacitated for purposes of ORS 124.100(1)(e)(C) and ORS 125.005(5), since a condition existed in which his ability to receive and evaluate information effectively or to communicate decisions was impaired to such an extent that he did at the relevant times presently lack the capacity to meet the essential requirements for his physical health or safety, including those actions necessary to provide the health care, mental health care, food, shelter, clothing, personal hygiene and other care without which serious physical injury or illness was likely to, and did, occur. As noted by Dr. De Jesus Rentas on the date Dyllan signed his parole agreement a condition existed such that Dyllan lacked a wide range of cognitive and functional abilities that rendered him unable to care for his own safety. Dyllan's significant mental health issues adversely affected;

1. His ability to speak and understand words at times were limited due to the internal stimuli he was experiencing.

2. His ability to eat due to the significant mental health issues he was experiencing.

3. His ability manage his medication due to the significant mental health issues he was experiencing.

4. His ability to communicate any decision that would meet the essential requirements for his physical health and safety.

96.

The conduct alleged constituted physical abuse within the meaning of ORS 124.105

97.

Under ORS 124.100(2) and (5) Defendant, State of Oregon, is responsible for the physical abuse of Dyllan as alleged in paragraphs 2-62 because the State of Oregon permitted Shannon

Page 25 – THIRD AMENDED COMPLAINT

Moshofsky and Dr. Jesus Rentas to engage in abuse by knowingly depriving Dyllan of access to mental health treatment despite knowledge of his deteriorating psychological conditions that resulted in self-harm and/or death.

98.

As a result of the State of Oregon's acts and omissions as alleged in this Claim for Relief, the Estate is entitled to three times any economic and non-economic damages awarded under the First Claim for relief under ORS 124.100(2)(a) and (b).

99.

Plaintiff is entitled to reasonable attorney fees under ORS 124.100(2)(c).

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for judgment as follows:

On the FIRST Claim for Relief for Wrongful Death, Plaintiff seeks from Defendant:

a. Non-Economic damages in the amount of $6,000,000.00;

b. Pecuniary losses to the Estate in the amount of $2,179.00; and

c. Costs and disbursements incurred herein.

WHEREFORE, Plaintiff prays for judgment as follows:

On the SECOND, THIRD, FOURTH, and FIFTH Claim for Relief for Constitutional Violations, Plaintiff seeks from the individually named Defendants:

a. Compensatory Damages in an amount to be determined at trial;

b. Punitive Damages in an amount to be determined at trial;

c. Attorney fees under 42 U.S.C. 1988; and

d. Costs and disbursements incurred herein.

Page 26 – THIRD AMENDED COMPLAINT

On the SIXTH Claim for Relief for Abuse of a Vulnerable Person, Plaintiff seeks from the State of Oregon:

      a.   Three times the amount of damages awarded in the First Claim for Relief;

      b.   Attorney fees under ORS 124.100; and

      **c.**   Costs and disbursements incurred herein.


Dated:  July 1, 2024.

ROSS LAW LLC.

s/ Jeremiah Ross_____
Jeremiah Ross, OSB 105980
Attorney for Plaintiff
Phone: (503) 224-1658
E-mail: ross@rosslawllc.com


**DEMAND FOR JURY TRIAL**


Page 27 – THIRD AMENDED COMPLAINT